**HUBBARD CHEVROLET COMPANY,**
**Plaintiff–Appellee, Cross–Appellant,**

v.

**GENERAL MOTORS CORPORATION,**
**Defendant–Appellant, Cross–Appellee.**

No. 88–4302.

United States Court of Appeals,
Fifth Circuit.

May 30, 1989.

Rehearing and Rehearing En Banc
Denied June 28, 1989.

Stephen M. Shapiro, Chicago, Ill., Natie P. Caraway, Joseph P. Wise, Robert P. Wise, Jackson, Miss., for defendant-appellant, cross-appellee.

Kenneth A. Rutherford, Dale F. Schwindaman, Jr., Jackson, Miss., for plaintiff-appellee, cross-appellant.

Before THORNBERRY, WILLIAMS and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

General Motors Corporation appeals a $2 million jury verdict for breach of an implied covenant of good faith awarded to the plaintiff, a Chevrolet dealer, after GM refused the dealer's requests to relocate the dealership. The dealer cross-appeals the district court's grant of summary judgment on its claim under the Mississippi Motor Vehicle Commission Law. We reverse the judgment entered on the jury verdict and affirm the district court's dismissal by summary judgment of the dealer's statutory claim.

## I.

Hubbard Chevrolet Co. operated a dealership in Utica, Mississippi from 1927 until 1987. The dealership agreement between Hubbard and General Motors specified Utica, population 1,000, as Hubbard's only authorized location. The agreement required GM's written approval for any change of dealership location.

Although Hubbard posted profits throughout the 1970s, Utica's lack of highway access, eroding population base and declining economy prompted Hubbard to request relocation in 1980. Hubbard was losing money by that time; it ultimately closed its doors in 1987. Hubbard wanted to move the dealership eighteen miles northeast to Raymond, Mississippi, a growing town of about 2,000 at that time located three miles from Jackson, the state capital. Hubbard bought property on the Jackson side of Raymond in 1979 in anticipation of the move.

In 1979, Raymond was located just within Hubbard's Area of Primary Responsibility (APR), the market area in which GM measures dealer sales and service performance. GM also estimates a dealer's potential for new car and truck sales based on new car registrations in the dealer's APR.

GM contends that it must maintain firm control over dealer location to insure adequate availability of dealer services for customers, and to assure dealers that they will earn a reasonable return on their investment. A dealer network planning consultant for GM testified that unilateral dealer location decisions would create chaos given that individual dealers—focusing only on their own best sales prospects—would ignore more stable areas. GM also presented evidence that it avoids placing dealerships in locations where survival would require them to sell vehicles in fellow dealers' APRs.

GM had assigned Jackson, the state's largest city, to other Chevrolet dealers in a separate Multiple Dealer Area (MDA). GM refused Hubbard's initial 1980 relocation request and its renewed requests from 1982 through 1985. GM did, however, offer to help Hubbard relocate to a larger dealership in Eunice, Louisiana.

GM cited four reasons for its refusal to approve Hubbard's relocation to Raymond: (1) GM's desire to maintain a Chevrolet dealer in Utica; (2) its concern that Hubbard wanted to poach on the Jackson MDA by virtue of Raymond's proximity to Jackson, rather than serve customers in Hubbard's own APR; (3) GM's desire to preserve its option to place a third dealer in Jackson or a nearby town at an optimal location; and (4) the conclusion that Hubbard's relocation to Raymond would not generate a sufficient sales increase to offset the costs. Hubbard contended that GM created makeweight arguments to camouflage a decision based on cronyism and the

desire to insulate the Jackson dealers from any competition.

In 1984, GM halved Hubbard's APR and reassigned Raymond to the Jackson MDA. GM said the reassignment resulted from a national study of the proper APR's for forty cities; it reasoned that Raymond should join the Jackson MDA because Raymond customers gravitate to the bigger city to buy their goods and services. Hubbard noted that very few MDA changes reduced a dealer's territory by fifty percent and portrayed the change as another instance of GM favoritism. The reduction of Hubbard's APR cut its planning potential but did not preclude Hubbard from selling cars to Raymond residents.

Hubbard renewed its relocation request in 1985. GM responded with a letter repeating its justifications for reassigning Raymond to the Jackson APR. The letter also stated that vehicle registration records indicated Utica would not be a profitable location for any future Chevrolet dealer and that GM would not continue dealer representation there. However, GM told Hubbard that it would continue to meet its obligations under the dealer agreement as long as Hubbard remained in Utica.

Hubbard sued GM in 1985 alleging that GM's refusal of Hubbard's relocation requests (1) breached its fiduciary duty; (2) breached an implied covenant of good faith and fair dealing; (3) constituted tortious interference with Hubbard's prospective Raymond customers; and (4) violated the federal Automobile Dealers' Day in Court Act and an analogous Mississippi statute. The district court granted summary judgment for GM on the tortious interference and statutory claims. *Hubbard Chevrolet Co. v. General Motors Corp.*, 682 F.Supp. 873 (S.D.Miss. 1987).

Ultimately, only the claim for breach of the implied good faith covenant went to the jury. The jury returned a $2 million verdict in Hubbard's favor, and the court entered judgment in that amount. GM appeals the judgment entered on the jury verdict; Hubbard appeals the district court's summary judgment in favor of GM on Hubbard's Mississippi Motor Vehicle Commission Law claim.

## II.

### A.

■ We first examine Hubbard's challenge to the district court's dismissal of Hubbard's claim under the Mississippi Motor Vehicle Commission Law, Miss.Code Ann. § 63–17–51 *et seq.*, following the court's favorable ruling on GM's motion for summary judgment. Summary judgment is proper when the record raises no issue of material fact and the movant is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). We conclude that the district court properly granted summary judgment on this claim.

The district court granted summary judgment on Hubbard's parallel claim under the federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.*, because Hubbard's proof did not establish that GM had violated the Act's special "good faith" standard. The DDCA allows a dealer to sue a manufacturer for damages caused "by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms and provisions of the franchise or in terminating, canceling or not renewing the franchise with said dealer...." 15 U.S.C. § 1222. The Act defines "good faith" as the "duty of each party ... to guarantee ... freedom from coercion, intimidation, or threat of coercion or intimidation from the other party...." 15 U.S.C. § 1221(e).

The district court noted that arbitrary actions by a manufacturer, standing alone, do not rise to the level of coercion and intimidation set out in the DDCA's narrow "good faith" definition. *Hubbard Chevrolet*, 682 F.Supp. at 877. *See also McDaniel v. General Motors Corp.*, 480 F.Supp. 666 (E.D.N.Y.1979), *aff'd*, 628 F.2d 1345 (2d Cir.1980); *Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932 (5th Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967). The court concluded that Hubbard's summary judgment

evidence regarding the refused relocation requests failed to support allegations of coercion or intimidation. *Hubbard Chevrolet*, 682 F.Supp. at 877. Hubbard does not challenge that ruling on appeal.

■ Instead, Hubbard argues that the district court erroneously granted summary judgment on its claim under the analogous Mississippi statute. That statute targets the same conduct as the federal act and defines "good faith" in the same terms as the DDCA. *See* Miss.Code Ann. §§ 63–17–73(1)(d), 63–17–55(16). Unlike the federal act, however, the Mississippi act then defines "coerce" as "the failure to act in good faith in performing or complying with any terms or provisions of the franchise or agreement." Miss.Code Ann. § 63–17–55(17). Hubbard relies on this difference to argue that the Mississippi statute incorporates a broader common law meaning of "good faith."

We reject this argument. Mississippi promulgated its statute after Congress enacted the DDCA, and in so doing it adopted the federal act's definition of "good faith." Hubbard points to no evidence indicating that the Mississippi statute's further definition of "coerce" represents an effort to broaden the scope of "good faith." We decline to read a broader definition into the Mississippi statute. *See Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981) (Congress presumed to have adopted existing judicial constructions of definition in Uniform Sales of Securities Act when it used that definition in Securities Act of 1933). *See also Southern Rambler Sales*, 375 F.2d at 935; *Globe Motors v. Studebaker–Packard Corp.*, 328 F.2d 645, 648 (3d Cir.1964); *Frank Chevrolet v. General Motors Corp.*, 304 F.Supp. 307, 316 (N.D. Ohio 1968), *aff'd*, 419 F.2d 1054 (6th Cir.1969); *Berry Bros. Buick, Inc. v. General Motors Corp.*,

257 F.Supp. 542, 546 (E.D.Pa.1966), *aff'd*, 377 F.2d 552 (3d Cir.1967). As with the federal DDCA, the district court correctly concluded that Hubbard's allegations of arbitrary conduct did not rise to the level of coercion and intimidation required by the Mississippi statute.

### B.

■ Turning to GM's challenge to the jury verdict, we agree that the implied covenant of good faith and fair dealing does not apply to this relocation dispute as a matter of law.[1]

Michigan common law, which controls under the dealer agreement, recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of contracts. *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich.App. 238, 357 N.W.2d 669, 672 (1984); *Burkhardt v. City National Bank of Detroit*, 57 Mich.App. 649, 226 N.W.2d 678, 680 (1975). Generally speaking, the implied covenant seeks to protect the contracting parties' reasonable expectations. *Compare Restatement (Second) of Contracts* § 205(a) ("Good faith ... emphasizes consistency with the justified expectations of the other party; it excludes [conduct that violates] ... community standards of decency, fairness or reasonableness") with Burton, *More on Good Faith Performance of a Contract*, 69 Iowa L.Rev. 497, 500 ("[B]ad faith performance occurs ... when discretion is used to recapture opportunities forgone upon contracting—when the ... party [who exercises discretion] refuses to pay the expected cost of performance.").

The implied covenant of good faith and fair dealing essentially serves to supply limits on the parties' conduct when their contract defers decision on a particular

---

1. Hubbard argues initially that GM waived its challenge to the implied good faith issue because GM did not challenge the issue's submission before its initial motion for directed verdict, in its second motion for directed verdict, or in its objections to the court's instructions.

   The record contradicts Hubbard's assertions. GM contested the implied good faith covenant's applicability in its motion for summary judg-

   ment, both motions for directed verdict and the brief submitted in support of those motions, and in its motion for judgment NOV. The district court also rejected a proposed GM jury instruction that excluded the good faith issue from jury consideration. GM preserved its argument for appellate review. *See Industrial Dev. Bd. v. Fuqua Indus.*, 523 F.2d 1226, 1238 (5th Cir.1975).

term, omits terms or provides ambiguous terms. *See Bushwick–Decatur Motors v. Ford Motor Co.,* 116 F.2d 675, 677 (2d Cir.1940) (applying Michigan law); *Ferrell,* 357 N.W.2d at 672; Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L.Rev. 369, 380 (1980). Consistent with this supplementing function, Michigan courts rely on the implied good faith covenant "[w]here a party to a contract makes the manner of its performance a matter of its own discretion...." *Burkhardt,* 226 N.W. 2d at 680; *see also Ferrell,* 357 N.W.2d at 672.[2]

Michigan law does not imply the good faith covenant where parties have "unmistakably expressed" their respective rights. *Bushwick–Decatur Motors,* 116 F.2d at 675; *see also* Burton, 69 Iowa L.Rev. at 500 ("Both the U.C.C. and the common-law cases make clear that the parties are free to determine by agreement what good faith will permit or require of them."). For example, in interpreting Michigan law the Second Circuit declined to limit an explicit at-will termination power granted both parties to a dealership contract. *Bushwick–Decatur Motors,* 116 F.2d at 675. This is consistent with our own conclusion that "[t]he implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984) (applying Louisiana law).

As a threshold matter, then, we must determine whether this dispute and the contract language governing it bring the covenant into play.

The contract at issue here consists of a Dealer Sales and Service Agreement and a Dealership Location and Premises Adden-

dum. In Art. II § B(1), the dealer agreement provides that "Dealer will conduct the Dealership Operations only from the location ... approved for that purpose by General Motors...." Under § B(2) a dealer who wants to relocate "agrees to give General Motors prior written notice so General Motors can discuss the effect of the proposed change with the Dealer. No change in Dealership Location ... will be made without the written approval of General Motors."

The Dealership Location and Premises Addendum to Hubbard's dealer agreement specifies Hubbard's location as White Oak Street in Utica. The addendum also states, "All changes in the Dealership Location ... that may be agreed upon by Dealer and General Motors pursuant to provision of Section B of Article II of the Dealer Agreement(s) ... shall be reflected in a new Dealership Location and Premises Addendum...."

In defining the contours of the implied covenant in Michigan, we find two cases that are helpful. *Burkhardt,* a leading Michigan case on the implied good faith covenant, examined a mortgage agreement calling for the defendant bank to establish an escrow fund "estimated by the Mortgagee" to be sufficient to pay taxes and insurance. The plaintiff mortgagors argued that the bank's accounting methods created a larger sum than necessary to cover these costs. *Burkhardt,* 226 N.W.2d at 680. The court concluded that the implied covenant of good faith applied by virtue of the mortgagee bank's "considerable" discretion to estimate those sums. *Id.* In so doing the court looked to the parties' expectations that the escrow fund would be "adequate" for taxes and insurance and no more. *See id.*

---

2. While the Michigan cases do not define "discretion," we look to this discussion:

Discretion in performance arises in two ways. The parties may find it to their mutual advantage at formation to defer decision on a particular term and to confer decisionmaking authority as to that term on one of them. Discretion also may arise, with similar effect, from a lack of clarity or from an omission in

the express contract. In either case, the dependent party must rely on the good faith of the party in control. Only in such cases do the courts raise explicitly the implied covenant of good faith and fair dealing, or interpret a contract in light of good faith performance.

Burton, 94 Harv.L.Rev. at 380 (footnotes omitted).

Relatedly, the Second Circuit—applying Michigan law—rejected application of the implied good faith covenant to a dealership contract allowing termination "at any time at the will of either party by written notice." *Bushwick–Decatur Motors,* 116 F.2d at 676–77.[3] The court concluded,

> With a power of termination at will here so unmistakably expressed, we certainly cannot assert that a limitation of good faith was anything the parties had in mind. Such a limitation can be read into the agreement only as an overriding requirement of public policy. This seems an extreme step for judges to take.

*Id.*

Applying the precedents to this case, we conclude that the district court erred when it instructed the jury on the implied covenant of good faith and fair dealing; the covenant has no role to play in the relocation dispute between GM and Hubbard. Unlike the discretionary language at issue in *Burkhardt,* this contract language leaves no room for a court or jury to supply limits. These clauses, which specify Hubbard's location at Utica and flatly preclude relocation absent GM's approval, more closely resemble the "unmistakably expressed" terms that excluded the covenant's application in *Bushwick–Decatur Motors,* 116 F.2d at 676–77. The contract does not limit the reasons upon which GM can base its relocation decisions. *See Lichnovsky v. Ziebart Int'l Corp.,* 414 Mich. 228, 324 N.W.2d 732, 736–37 (1982). Hubbard and GM have deferred no decisions regarding relocation or the relevant factors. They gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of these parties.

Hubbard agreed to operate at the specified location and to request relocation in writing. It can point to no portion of this contract creating "reasonable expectations" that GM would grant such requests.

The written notice requirement for relocation requests in no way dilutes GM's right to keep the dealership in Utica. Substituting this jury's sense of what GM should have done for what the contract expressly allowed GM to do represents a veto of contractual language that *Bushwick–Decatur Motors* and our own case law counsel us to avoid.

This court's observations regarding provisions permitting terminations at will in *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 138 (5th Cir.), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979) are relevant in this context. In *Corenswet* we refused to apply UCC § 1–203's good faith obligation to override an express provision in a distributorship contract permitting unilateral termination without cause. *Id.* The court described the implied good faith standard as an "erratic" test for regulating such terminations and stated, "Since a termination without cause will almost always be characterizable as a 'bad faith' termination, focus on the terminating party's state of mind will always result in the invalidation of unrestricted termination clauses." *Id.* Absent contractual language that brings the implied good faith covenant into play, we decline to allow a jury to reevaluate the wisdom of the parties' choice to leave relocation decisions to GM.

We do not reach the parties' remaining points on appeal. The judgment below is

AFFIRMED in part, REVERSED in part and REMANDED for entry of a take nothing judgment in favor of General Motors.

---

**3.** *But cf. Larese v. Creamland Dairies, Inc.,* 767 F.2d 716, 717 (10th Cir.1985)(under Colorado law, franchisor cannot unreasonably withhold consent to assignment of franchise rights under contract requiring franchisor's prior written consent to transfers); *Dunfee v. Baskin Robbins, Inc.,* 720 P.2d 1148, 1153–54 (Mont.1986) (applying duty of reasonableness to invalidate franchisor's refusal to permit franchisee to move shop without reference to specific contract language).