806 F.Supp. 835 (1992)
Joseph JAMES, Darrell Woods, and St. Louis Appliance Parts, Inc., a corporation, Plaintiffs,
v.
WHIRLPOOL CORPORATION, a corporation, Defendant.
No. 90-2115-C-5.
United States District Court, E.D. Missouri, E.D.
October 26, 1992.
*836 *837 James Brandenburg, Brandeburg, Kaveney & Lownsdale, St. Louis, Mo., for plaintiffs.
Daniel T. Rabbit, Rabbitt, Pitzer & Snodgrass, St. Louis, Mo., for defendant.

MEMORANDUM AND ORDER
LIMBAUGH, District Judge.
Plaintiffs, former distributors of Whirlpool appliance parts, filed this action against Whirlpool Corporation claiming 1) breach of contract, 2) breach of the implied covenant of good faith and fair dealing, and 3) interference with a business relationship in connection with a proposed sale of plaintiffs' business. Plaintiffs originally filed this action in the Circuit Court for the City of St. Louis, State of Missouri. Defendant removed to federal court based on diversity jurisdiction. This matter is before the Court on the parties' cross-motions for summary judgment.

STANDARD FOR SUMMARY JUDGMENT
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
*838 Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to an examination of the facts.

FACTS
Plaintiffs Joseph James and Darrell Woods were equal shareholders of St. Louis Appliance Parts, Inc. (SLAP), a Missouri corporation in business selling appliance parts for several national brands.
Whirlpool Corporation (Whirlpool) is a Delaware corporation which manufactures and distributes appliances and appliance parts.
One of SLAP's lines was Whirlpool. SLAP sold replacement Whirlpool appliance parts as an authorized Whirlpool parts distributor.
From 1976 through 1989 SLAP entered into distributor agreements with Whirlpool. Each agreement was for a term of one year. Whirlpool had the option to renew the Agreement each subsequent year.
SLAP also distributed replacement parts for other original equipment manufacturers, at one time including Speed Queen, Huebsch, General Appliance, General Electric, Westinghouse, Gibson, Troy, Kelvinator, and Frigidaire. General Electric had terminated SLAP's distributorship in 1985, and in 1987 SLAP discontinued its Gibson and Kelvinator distributorships. By 1987, Whirlpool represented a great majority of SLAP's business.
SLAP's major competitors in the St. Louis area were Marcone Appliance Parts (Marcone), Aberdeen Appliance Parts (Aberdeen), and St. Peters Appliance Parts. In 1987 Marcone was the only other Whirlpool authorized parts distributor in the St. Louis market. Historically, SLAP had a very small market share in St. Louis, and its business declined significantly in the 1980's. SLAP's gross sales decreased from a high of approximately $375,000 in 1985 to $40,000 in 1990. In 1982 SLAP's sales of Whirlpool products were $144,000 but declined to $82,000 by 1986. By 1987, according to Whirlpool's estimate, Marcone sold approximately ninety-five percent of Whirlpool's parts in St. Louis, and SLAP was responsible for the remaining five percent. At this time Marcone was also one of Whirlpool's largest parts distributors in the country, operating several locations in the midwest as well as in Florida. SLAP was one of the smallest distributors and had difficulty meeting Whirlpool's sales quotas. (Deposition of Ronald F. Iannelli, July 25, 1991, p. 19)
By 1987 Whirlpool considered SLAP a border-line distributor and a "non-factor" in the St. Louis market. Whirlpool recognized that SLAP would be forced out of business without the Whirlpool distributorship. Whirlpool decided to retain SLAP due to its long-term association with Whirlpool.
*839 Due to declining sales and competition, James and Woods contemplated selling their business. In the spring of 1987, negotiations took place between the two partners and Aberdeen. Aberdeen planned to purchase SLAP to acquire the Whirlpool distributorship. Aberdeen intended to close SLAP's operations located in a depressed section of the City of St. Louis, and combine operations into its own facility located in St. Louis County.
Before entering into negotiations with SLAP, Aberdeen twice had attempted to obtain a Whirlpool parts distributorship. In September 1975 Aberdeen asked Whirlpool for a distributorship in the St. Louis area. Whirlpool declined, stating that the three distributors at the time provided sufficient coverage. In August 1976 Aberdeen again contacted Whirlpool and requested a franchise. At that time, a Whirlpool representative visited the Aberdeen facilities but the company again refused to add a fourth distributor in the St. Louis market. In 1987, Ronald Iannelli, a Whirlpool representative, who was in St. Louis reviewing SLAP's performance, visited Aberdeen to evaluate its operations. Iannelli considered Aberdeen a more effective parts distributor than SLAP and in a memorandum to his superiors, he recommended that Aberdeen be approved as a distributor. Iannelli's superiors did not act upon his recommendation.
In May of 1987, James and Woods agreed that they would sell their stock to Aberdeen in exchange for $370,000. As a result of this transaction, Aberdeen would be the sole shareholder of SLAP. The purchase agreement was conditioned upon Aberdeen being retained as a distributor of all lines that SLAP carried at that time, including Whirlpool.
SLAP's distributorship agreement with Whirlpool provided that its rights could not be transferred without the prior written consent of Whirlpool. Paragraph 15 of the Agreement provides:
15. None of the rights or obligations under this agreement shall be subject to assignment, expressly, by operation of law, or otherwise, without the prior written consent of Whirlpool. In the event such an assignment occurs, without the prior written consent of Whirlpool, Whirlpool shall have the right, if it so elects, to consider such assignment an act of termination of this agreement by you effective upon the occurrence of such assignment. Distributorship Agreement, Defendant's Exhibit 4 dated 10/15/86, pp. 4-5 (attached to Whirlpool's motion for summary judgment).
The agreement also provides that Whirlpool can terminate the Agreement for a change in the control or management of SLAP. Specifically, paragraph 10.d. provides:
10.d. A change in the direct or indirect control or management of your Company which is unacceptable to Whirlpool, including, but not limited to, any change in control resulting from the sale or other transfer of capital stock of, or any other proprietary interest in, your Company. You agree to furnish Whirlpool with the names of all persons and other legal entities which have any beneficial ownership in, and management or control of your Company, as well as the exact nature of such ownership, management and control. Should any such change occur, you agree to provide all the above information, in a form and in such detail as is satisfactory to Whirlpool.
After reaching agreement on the purchase terms, James contacted Whirlpool regarding the proposed sale, and asked that Aberdeen be considered as a distributor. Whirlpool noted Aberdeen's successful business operations, but the corporation did not approve the distributorship transfer.
As a result of Whirlpool's rejection of the distributorship transfer, SLAP's deal with Aberdeen fell through. Shortly after Whirlpool declined to authorize Aberdeen as a new distributor, Whirlpool approved an additional location for its existing Marcone distributor. SLAP continued as a Whirlpool distributor in 1987, and entered into almost identical distributor agreements in 1988 and 1989.
In June of 1989, James and Woods again tried to sell their business. Again, Whirlpool *840 rejected the distributorship transfer to Aberdeen. In response, plaintiffs sent a letter to Whirlpool candidly expressing their frustration, and claiming that Whirlpool's refusal to transfer the distributorship was an immoral and unethical business practice. In October of 1989, Whirlpool notified SLAP that it would not renew the distributorship agreement for 1990.

ANALYSIS
Plaintiffs Joseph James and Darrell Woods are residents and citizens of Missouri. St. Louis Appliance Parts, Inc. is a corporation organized and existing under the laws of the State of Missouri.
Defendant Whirlpool Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Michigan.
The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) as the dispute arises out of events occurring in this district.
The distributor agreement specifies that it shall be construed, interpreted and applied in accordance with Michigan law. In deciding a diversity case, a federal district court applies the choice-of-law rules of the forum state in which the court sits. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 71, 58 S.Ct. 817, 819, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Empire Petroleum, Inc. v. D.F. & Associates, Inc., 538 F.Supp. 615 (E.D.Mo.1982).
Nonetheless, parties to a contract may make a choice as to the state whose laws shall govern on interpretation of their contractual rights and duties as was done by the parties in this case. The federal rule on the enforceability of forum selection clauses requires that the clause should control and be enforced unless it can be shown that the clause is unreasonable and unjust, or that the clause is invalid because of fraud or overreaching, or that the suit is broader than the intended scope of the clause. See, Carnival Cruise Lines, Inc. v. Shute, ___ U.S. ___, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); Medicine Shoppe International v. Browne, 683 F.Supp. 731, 733 (E.D.Mo.1988). None of these exceptions are applicable here, and this Court elects to apply Michigan law.

Count I: Breach of Contract

A. Whirlpool's denial of assignment to Aberdeen

Count I of plaintiffs' complaint alleges that Whirlpool breached the distributor agreement terms when it refused to permit Aberdeen to take control of the distributorship. Plaintiffs argue that, pursuant to the terms of paragraph 10(d) of the Agreement, as long as SLAP produced an acceptable transferee, Whirlpool would consent to the distributorship transfer.
Plaintiffs claim that Whirlpool violated paragraph 10(d) of the agreement when it did not state that it found Aberdeen unacceptable. According to plaintiffs, Whirlpool recognized the clear superiority of Aberdeen's business capability, yet the corporation arbitrarily withheld its consent, causing the termination of the proposed transaction.
Plaintiffs' argument is unfounded. First, as previously stated, the Agreement unambiguously states that SLAP's rights under the Agreement could not be transferred without the prior written consent of Whirlpool. Paragraph 15 of the Agreement gives Whirlpool unlimited authority to refuse assignment.
Further, paragraph 10(d) does not apply to the facts of this case. It states that Whirlpool can terminate the distributor agreement after an unacceptable change in control or management of SLAP. In the present dispute, no change in SLAP's ownership actually took place. The agreement between SLAP and Aberdeen was contingent on Whirlpool's approval. After Whirlpool declined to approve the distributorship *841 change, Aberdeen refused to purchase SLAP. Whirlpool terminated the distributor agreement with SLAP after its negotiations with Aberdeen ceased and while James and Woods continued to own SLAP. Therefore, paragraph 10(d) does not require Whirlpool either approve the transfer to Aberdeen or to state that it found Aberdeen unacceptable.
Even if paragraph 10(d) were to apply to the facts in this case Whirlpool did not breach the contract for failing to state why it refused to approve the transfer. Paragraph 10(d) unambiguously states that Whirlpool can terminate the agreement if SLAP transfers its ownership or control to a purchaser which Whirlpool considers unacceptable. The Agreement does not require Whirlpool to provide justification for its decision to reject transfer. Therefore, even assuming paragraph 10(d) applies to the present dispute, Whirlpool did not violate its terms when it rejected Aberdeen without providing reasons for its decision.

B. Unconscionability

In Count I SLAP also claims that paragraphs 10(d) and 15, limiting the transfer of management and control, make an unconscionable adhesion contract that is unenforceable.
The concept of unconscionability is generally designed to prevent unjust enforcement of onerous contract terms that one party is able to impose on another because of a significant disparity in bargaining power. General Aviation, Inc. v. Cessna Aircraft Co., 703 F.Supp. 637, 645-46 (W.D.Mich.1988); modified, 915 F.2d 1038 (6th Cir.1990) (citing Anderson, 2 Uniform Commercial Code, 3rd ed., Section 2-302:4). Michigan courts recognize a two-part test to determine whether a contract provision is one of adhesion and unenforceable. First, the Court will consider the relative bargaining power of the parties, their relative economic strength, and the alternative sources of supply. Second, the courts will consider whether the challenged terms are substantially reasonable. Even if the contract is adhesive under the first prong, still the challenged term is enforceable if it is substantively reasonable and not oppressive or unconscionable. Ryoti v. Paine, Webber, Jackson & Curtis, Inc., 142 Mich.App. 805, 371 N.W.2d 454 (1985).
With regard to the first prong, plaintiffs claim that the relative bargaining power of SLAP and Whirlpool was unequal because SLAP would be approved for the following year only if it agreed to all of the provisions in the Agreement. Plaintiffs further claim that Whirlpool knew that SLAP was slowly declining in strength and that it needed the Whirlpool line to remain vital. Because of SLAP's declining strength, plaintiffs argue it was in no condition to bargain with Whirlpool over the terms of the contract.
Whirlpool counters that requiring written consent prior to transferring a distributorship to a new owner is not substantially unfair as a matter of law. Whirlpool states that SLAP's declining business capability was a result of its own actions, and should not be a consideration in assessing bargaining power. Otherwise, Whirlpool claims, the worse a distributor performed, the more Whirlpool would be prohibited from exercising its contractual rights. Finally, Whirlpool notes that plaintiffs admitted in deposition that SLAP entered into all of the fourteen yearly distributorship agreements voluntarily, and that SLAP never objected to, or attempted to change any terms in the agreements.
The Court finds that the contractual terms between the two commercial entities, SLAP and Whirlpool were substantially reasonable and not oppressive. While there may have been a difference in strength of bargaining positions between SLAP and Whirlpool, SLAP's substantial reliance on Whirlpool's distributorship is not a result of the contract or of Whirlpool's actions. SLAP had the opportunity to increase its bargaining position and independence emphasizing its other distributor lines, or by developing strategies to increase overall revenue. Therefore, these terms were not unconscionable.

*842 C. Michigan Franchise Law

In Count I, the plaintiffs also claim that SLAP was a Whirlpool franchisee, and that Whirlpool breached the Michigan Franchise Investment Law.
The terms of the Michigan Franchise Investment Law governs the relationship and agreement between the two parties. The Michigan Franchise Investment Law regulates the offer, sale and purchase of franchises, and prohibits fraudulent practices in relation thereto. Section 445.1502 (1984) of the statute states that a "franchise" is a contract or agreement, either express or implied, whether oral or written between two or more persons to which all of the following must apply.
(a) A franchise is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor.
(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logo type, advertising, or other commercial symbol designating the franchisor or its affiliate.
(c) The franchisee is required to pay, directly or indirectly, a franchise fee.
Plaintiffs contend that SLAP's relationship with Whirlpool meets the requirement of subsection (a) of the Michigan Franchise Investment Law because SLAP operated under a marketing plan or system prescribed in substantial part by a franchisor. SLAP contends that the Agreement required it to "advertise and promote the sale and use of Whirlpool brand service parts" in its merchandising area. SLAP claims that this language combined with sales quotas established by Whirlpool constitutes a marketing plan.
Plaintiffs contend that under the distributor agreement, SLAP also meets subsection (b) in that SLAP had to sell Whirlpool parts under guidelines set by Whirlpool. The Agreement states that SLAP was to "abide by the parts distributor policies and procedures ... as established by Whirlpool." Plaintiffs also claim SLAP paid an "indirect" franchise fee to Whirlpool.
Plaintiffs' argument is not well taken. The Agreement between SLAP and Whirlpool was a distributorship agreement, not a franchise agreement. Nowhere in the Agreement is the word franchise used. Further, the Agreement fails to meet the statutory requirements for a franchise.
First, the Agreement does prescribe a marketing plan or system to SLAP. SLAP was expected to develop a marketing plan, but to do so on their own. Whirlpool never dictated the form or content of a SLAP marketing plan. Furthermore, Whirlpool states that it had very little control over SLAP's decision-making process. SLAP had the right to sell Whirlpool parts to any buyer in the United States. SLAP also had the right to train their personnel in any manner that they chose. Finally, Whirlpool states that it could not dictate how SLAP was to manage its day-to-day operations.
Second, with regard to subsection (b), although SLAP obtained a majority of its revenue through Whirlpool parts distribution, SLAP's business was not substantially associated with the Whirlpool trademark. In addition to Whirlpool parts, SLAP also distributed replacement parts for Speed Queen, Huebsch, General Appliance, Westinghouse, Gibson, Troy, Kelvinator and Frigidaire. SLAP had its own independent identity separate from the many distributor lines that it carried. Further, SLAP's name did not, in any way, associate itself with Whirlpool.
Finally, SLAP paid neither a direct franchise fee to Whirlpool nor an "indirect" franchise fee and therefore, the Agreement failed to meet the requirements of subsection (c). Plaintiffs have presented no cases in which a Michigan court recognized an indirect franchise fee. They rely on a Seventh Circuit case, applying Indiana law, holding that excess inventory requirements can constitute a franchise fee if the buyer is required to purchase a quantity of goods so unreasonably large that such goods may not be resold within a reasonable period of *843 time. Wright-Moore Corporation v. Ricoh Corporation, 908 F.2d 128, 136 (7th Cir.1990).
SLAP contends that Whirlpool required it to order replacement parts during off seasons, and that SLAP, at all times, had to stock a 45-day supply of inventory. In fact, Whirlpool recommended a 45-day inventory program for its distributors. SLAP has not shown that the inventory requirements were unreasonable. SLAP has failed to establish an indirect franchise fee.
Plaintiffs' claims under the Michigan Franchise Investment Law are unfounded as SLAP was not a franchisee under the law.

Count II: Breach of Covenant of Good Faith and Fair Dealing

In Count II, plaintiffs allege that Whirlpool breached the covenant of good faith and fair dealing when it refused to approve SLAP's assignment to Aberdeen. Plaintiffs claim that the agreement as to the transfer in management or ownership was ambiguous, and that the words "unacceptable" and "consent" are completely within Whirlpool's discretion. Plaintiffs contend that the nature of these terms obligated the defendant to use good faith and fair dealing when contemplating SLAP's distributorship transfer request, and that defendant breached this duty.
Michigan common law recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of all contracts. Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 876 (5th Cir.1989); Ferrell v. Vic Tanny Int'l Inc., 137 Mich. App. 238, 357 N.W.2d 669, 672 (1984). The covenant seeks to protect the contracting parties' reasonable expectations.
Good faith emphasizes consistency with the justified expectations of the other party; it excludes conduct that violates community standards of decency fairness or reasonableness. Bad faith performance occurs when discretion is used to recapture opportunities foregone upon contracting  when the party who exercises discretion refuses to pay the expected cost of performance.
Hubbard, 873 F.2d at 876 (citation omitted).
The implied covenant of good faith and fair dealing supplies limits on the parties' conduct when their contract defers a decision on a specific term, omits a term, provides unambiguous term, or when a contractual party makes the manner of its performance a matter of its own discretion. Hubbard, 873 F.2d at 876-77. However, Michigan does not supply the good faith covenant when parties have unmistakably expressed their respective rights. Id. 873 F.2d at 877. The Michigan courts have concluded that the implied obligation to execute a contract in good faith usually modifies the express terms of the contract and therefore should not be used to override or contradict them.
In Hubbard, the Fifth Circuit addressed the applicability of the covenant of good faith and fair dealing under Michigan law. The court rejected application of the implied covenant to a dispute over contractual terms which specified a car dealer's location and precluded relocation without General Motor's written approval. Hubbard, 873 F.2d at 878. The Fifth Circuit noted that the terms were unmistakably expressed, and in effect gave GM the authority to approve or disapprove the relocation for its own reasons. The court held that the terms thus set out the limits of what the contract requires of these parties. Id.; See also Bushwick-Decatur Motors v. Ford Motor Co., 116 F.2d 675, 676-77 (2d Cir.1940) (applying Michigan law and rejecting application of the good faith doctrine allowing termination of a contract at the will of either party).
In the present dispute, the terms of the Agreement are unmistakably expressed. Paragraph 15 plainly provides that SLAP could assign its rights under the Agreement only upon prior written consent. The Agreement does not limit Whirlpool's discretion in approving or disapproving a transfer. Agreement, Paragraph 15. If an assignment occurred without the prior consent of Whirlpool, the Agreement *844 unambiguously grants Whirlpool the right to terminate the Agreement. Agreement, Paragraph 15. Even without an unapproved assignment, Whirlpool could terminate for a change in management or control which it found unacceptable. Paragraph 10(d). As in Hubbard, the parties set out the limits of what the contract required. The covenant of good faith will not override the express terms of the agreement.

Count III: Interference with Business Relations

In Count III, plaintiffs allege that Whirlpool acted intentionally and without justification when refusing to approve the transfer to Aberdeen and thereby interfered with SLAP's business relationship with Aberdeen.
To prove a claim of tortious interference with a business relationship plaintiffs must show the intentional doing of a per se wrongful act, or the doing of a lawful act with malice, and which is unjustified in law for the purpose of invading the contractual rights or business relationship of another. A "per se wrongful act" is defined as one that is inherently wrongful or one that is never justified under any circumstances. Formall, Inc. v. Community National Bank, 166 Mich.App. 772, 421 N.W.2d 289, 292-93 (1988). When a defendant is motivated by legitimate personal and business reasons, there can be no "per se wrongful act." Id. 421 N.W.2d at 293. See also Community Title Co. v. Roosevelt Federal S & L Assn., 796 S.W.2d 369, 372 (Mo. banc 1990). (A claim of tortious interference requires proof of contract or valid business expectancy, defendant's knowledge of the contract or relationship, intentional interference by the defendant inducing or causing breach of contract or relationship, absence of justification and damages resulting from defendant's conduct.)
In the present dispute, Whirlpool declined to approve the distributorship transfer, while stating that there were a sufficient number of distributors in the St. Louis marketplace. Plaintiffs note that shortly after Whirlpool terminated SLAP's distributorship Agreement with SLAP, it approved another location for its Marcone distributor. Plaintiffs claim Whirlpool's actions and explanations were unjustified and constituted intentional interference with the proposed stock sale.
As a result of Whirlpool's denial of SLAP's assignment to Aberdeen, the stock sale was not completed, however Whirlpool did not and could not bar the transaction. Only SLAP and Aberdeen could decide whether to proceed with the sale based upon the knowledge of Whirlpool's decision.
The Agreement between Mr. James and Mr. Woods and Aberdeen was for a sale of their SLAP stock provided Whirlpool approved SLAP's assignment of its contractual rights. Whirlpool denied the approval of the assignment not to interfere with any business expectancy of plaintiffs, but for a legitimate business justification. Whirlpool certainly had a legitimate economic interest in choosing who would be a distributor of its products. The Agreement gave Whirlpool an unqualified right to withhold its authorization of Aberdeen as a distributor and of the transfer of the Whirlpool line to Aberdeen. As a matter of law, Whirlpool did not interfere with plaintiffs' business relationship.
For the foregoing reasons, defendant has demonstrated that there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law.
Accordingly,
IT IS HEREBY ORDERED that defendant motion for summary judgment is GRANTED and plaintiffs' motion for summary judgment is DENIED. Judgment shall be entered in favor of defendant and against plaintiff on the merits of plaintiffs' complaint.