Fuller Ford v. Ford Motor et al.     CV-00-530-B    08/06/01

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Fuller Ford, Inc., et al.</u>

   v.                                    Civil No. 00-530-B
                                      Opinion No. 2001 DNH 144
<u>Ford Motor Company and</u>
<u>Ford Motor Credit Corporation</u>


<u>MEMORANDUM AND ORDER</u>

Fuller Ford, Inc., Frederick J. Fuller, and Sharen J. Fuller bring this suit, alleging that Ford Motor Company ("Ford") and Ford Motor Credit Corporation ("FMCC") breached their contractual obligations when they failed to relocate, and provide financial assistance to, Fuller Ford's retail automobile dealership. Plaintiffs also assert tort claims based on the same conduct, as well as claims under the Automobile Dealer Day in Court Act, 15 U.S.C. § 1221 <u>et</u> <u>seq.</u>, the New Hampshire Motor Vehicle Franchise Act, N.H. Rev. Stat. Ann. § 357-C:1 <u>et</u> <u>seq.</u>, and the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1 <u>et</u> <u>seq.</u>  I have before me Ford's motion to dismiss, (Doc. No. 11), and FMCC's motion to dismiss, (Doc. No. 12).  For the

reasons set forth below, I deny in part and grant in part Ford's motion to dismiss, I deny FMCC's motion to dismiss, and I order plaintiffs to file an amended complaint.

## I.  BACKGROUND[1]

Frederick Fuller is the sole shareholder of Fuller Ford, Inc.  In 1993, Fuller Ford acquired a Ford dealership in Bristol, New Hampshire.  Fuller Ford sold and leased Ford automobiles, and sold Ford parts, pursuant to a Dealer Sales and Service Agreement with Ford (the "Dealer Agreement").

Despite their successful business relationship, both Ford and Fuller Ford recognized from the start that the Bristol site was undesirable.  First, the franchise was located in a small town, far from any major highway, and was therefore difficult for customers to access.  Second, the facility itself was deficient in many respects, for example:  (1) it did not comply with the Americans with Disabilities Act; and (2) the parking lot, parts department, and service areas were too small.  Because upgrading

---

[1]  The background facts set forth in this Memorandum and Order are taken from plaintiffs' First Amended Complaint ("Cplt."), (Doc. No. 8).

the facilities would be expensive and would not cure the problems inherent in the location of the dealership, the parties soon began to explore the possibility of moving the dealership to a new location prior to the scheduled expiration of Fuller Ford's lease in April 1999.

## A.    The Proposed New Hampton Relocation

In April 1996, Fuller Ford, with the assistance of Ford, located a parcel of land in New Hampton that it thought would make a good location for its franchise.  Ford's representatives inspected the proposed site and agreed that it was ideal.  Fuller Ford purchased the property for $184,400.

Under the terms of the Dealer Agreement, Fuller Ford could not relocate its dealership without the prior written consent of Ford.  Jeff Friedstedt, Ford's Regional Sales Manager, told Frederick Fuller that Ford would approve a relocation to the New Hampton site and that he should begin preparations for the move. Although Mr. Fuller had kept the purchase of the New Hampton site a secret, a representative of Ford told Fuller Ford's employees that the relocation would occur.

Frederick Fuller formally advised Ford of the proposed relocation by letter dated June 28, 1996.  Ford's regional

representative recommended that Ford approve the relocation. Despite the assurances of Ford's regional representatives that this was a mere formality, and that Ford would support the relocation, Ford disapproved of the relocation by letter dated September 13, 1996.

The letter stated, in relevant part, as follows:

> We regret that we cannot support relocation to this site due primarily to its not being suitably situated to provide convenient sales and service for the majority of our customers in the Bristol, NH market area . . . We support your efforts to improve sales and service capacity and encourage you to consider other alternatives which will satisfy the requirements of Ford customers in your market area.

On September 30, 1996, Frederick Fuller met with Ford's regional representatives to discuss Ford's decision to deny his relocation request. Although Mr. Fuller raised the possibility of suing Ford over its decision, he instead decided to appeal that decision to the Ford Dealer Policy Board (the "Policy Board"). The Policy Board heard his appeal on December 17, 1996.

**B.  The Proposed Plymouth Relocation**

On February 26, 1997, Len Alaimo of the Policy Board called Frederick Fuller to advise him informally that the Policy Board

was disinclined to reverse Ford's decision.  Alaimo indicated, however, that Ford would support a relocation to Plymouth, New Hampshire.  The Policy Board never rendered a formal ruling on Fuller Ford's appeal.

Ford's regional office advised Fuller Ford that a former Chevrolet store in Plymouth was being auctioned off and that this would be a good relocation site.  Fuller Ford acquired the site at auction for $750,000, plus $100,000 in back taxes, and $50,000 for equipment and furnishings.  Fuller Ford advised Ford that it wished to relocate to the new site soon and that it needed a prompt answer because of the expense of simultaneously owning both the Plymouth and New Hampton sites, while also maintaining the Bristol dealership.

Ford's regional representatives recommended to Ford that it approve the relocation to Plymouth.  They recognized that a successful relocation would solve their "dealer relations problem" with Fuller Ford and might prevent litigation over the failed New Hampton relocation.  In a memorandum to Ford, a regional representative emphasized that the Plymouth relocation should be approved because Ford "had encouraged Mr. Fuller to develop land he already owned in the Plymouth area as a possible

-5-

location or seek out other possible sites in that town." In order to accomplish the relocation, Ford needed to remove Plymouth from the sales territory of another Ford dealer, Meredith Motors. Ford assured Fuller Ford that this would not be a problem and that no dealers would protest the realignment.

In November and December of 1997, Ford approved the realignment, the relocation of Fuller Ford to Plymouth, and the payment of $100,000 to Fuller Ford to assist it in opening the new facility. Fuller Ford hoped to begin operating from the Plymouth site on or after February 28, 1998.

In February 1998, Ford notified Meredith Motors, and other dealers in the Plymouth area, of the realignment and relocation. Meredith Motors filed a protest with the New Hampshire Motor Vehicle Industry Board (the "Motor Vehicle Board"), claiming that Ford had removed Plymouth from its sales territory solely to facilitate the relocation of Fuller Ford, in the hopes of avoiding a lawsuit over the failed New Hampton relocation. Therefore, Meredith Motors claimed, Ford lacked "good cause" to modify its sales territory and relocate Fuller Ford to Plymouth, as is required by the Motor Vehicle Franchise Act, N.H. Rev. Stat. Ann. § 357-C:9.

Ford sought a declaratory judgement in this court that its attempt to alter Meredith Motors' sales territory and relocate Fuller Ford was permissible.  On August 24, 2000, I granted Meredith Motors' motion for summary judgement.  See Ford Motor Co. v. Meredith Motor Co., 2000 DNH 186 (Aug. 24, 2000); see also Ford Motor Co. v. Meredith Motor Co., 2000 DNH 187 (Aug. 24, 2000) (denying Ford's motion to dismiss Meredith Motors' counterclaims).

On August 16, 2000, the Motor Vehicle Board found that Ford lacked good cause to relocate Fuller Ford to Plymouth.  The Motor Vehicle Board stated that:

> Ford's primary reason for relocating Fuller
> to Plymouth was to avoid possible bad will,
> requests for financial assistance, or a
> lawsuit resulting from any injuries Fuller
> experienced after being denied permission to
> relocate to New [Hampton].  Ford seeks this
> result without regard to any harm resulting
> to [Meredith Motors], and without attempting
> meaningfully to negotiate a mutually
> acceptable solution with [Meredith Motors].

Due to the length of the Motor Vehicle Board's deliberations and the uncertain outcome, Fuller Ford renewed its lease in Bristol for one year.  However, it struggled to maintain its Bristol operations while carrying the costs of the Plymouth and

New Hampton properties.

In December 1999, FMCC, without notice, terminated Fuller Ford's line of credit, which Fuller Ford needed to purchase new vehicle inventory. FMCC based its decision on Fuller Ford's alleged failure to make timely payments. Fuller Ford wrote to Ford protesting FMCC's actions, but FMCC declined to change its decision. By letter dated December 30, 1999, Fuller Ford advised FMCC that it had "temporarily suspended" the sale and service of Ford vehicles because of FMCC's suspension of its line of credit. Fuller Ford continued to operate until March 31, 2000, selling only used cars.

Fuller Ford, Frederick Fuller, and Sharen Fuller initiated this litigation against Ford and FMCC on November 13, 2000.[2]

## II.  <u>STANDARD OF REVIEW</u>

A motion to dismiss based on Fed. R. Civ. P. 12(b)(6) requires the court to accept the well-pleaded facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff. <u>See</u> <u>Aybar v. Crispin-Reyes</u>, 118 F.3d 10, 13 (1st

---

[2]  Sharen Fuller, the wife of Frederick Fuller, owns an interest in the New Hampton and Plymouth sites.

Cir. 1997); <u>Washington Legal Found. v. Massachusetts Bar Found.</u>, 993 F.2d 962, 971 (1st Cir. 1993).  I may dismiss the complaint only if, when viewed in this manner, it appears beyond doubt that the plaintiff can prove no set of facts that would entitle her to relief.  <u>See</u> <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 514 (1st Cir. 1988) (internal citation omitted).

The threshold for stating a claim under the federal rules "may be low, but it is real."  <u>Id.</u>  While I must construe all well-pleaded facts in the plaintiff's favor, I need not accept a plaintiff's "unsupported conclusions or interpretations of law." <u>Washington Legal Found.</u>, 993 F.2d at 971.

I apply this standard in reviewing defendants' motions to dismiss.

## III.  **DISCUSSION**

Plaintiffs contend that Ford made a number of misrepresentations with regard to the proposed relocation of Fuller Ford's franchise to New Hampton and, ultimately, to Plymouth.  Based on these alleged misrepresentations, plaintiffs assert claims against Ford for:  (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing;

(3) violation of the Automobile Dealer Day in Court Act ("ADDCA"); (4) violation of the Motor Vehicle Franchise Act; (5) violation of the Consumer Protection Act; and (6) fraud. In addition, plaintiffs assert claims against FMCC for breach of contract and breach of the implied covenant of good faith and fair dealing.

Ford argues that all claims against it relating to Fuller Ford's proposed relocation to New Hampton are barred by the relevant statutes of limitation. Ford also moves to dismiss most of the remaining claims against it for failure to state a claim upon which relief can be granted.[3] FMCC moves to dismiss both claims against it.

Because plaintiffs' allegations of fraud lie at the heart of this litigation, I begin by addressing the sufficiency of those allegations.

---

[3] In Count IV of their amended complaint, plaintiffs allege that Ford violated Section 357-C:3, I of the Motor Vehicle Franchise Act and Section 358-A:2 of the Consumer Protection Act. See Cplt. ¶¶ 104-108. Ford does not move to dismiss plaintiffs' Consumer Protection Act claims. But see Colonial Imports Corp. v. Volvo Cars of North Am., Inc., 2001 DNH 008, 24-28 (Jan. 9, 2001) (holding that claims between motor vehicle dealers and manufacturers are not actionable under the Consumer Protection Act).

## A.  Fraud

Plaintiffs assert three fraud claims against Ford.  Cplt. ¶¶ 130-34.  As noted above, the allegations of fraud that underlie these three claims also form the basis of plaintiffs' other common law and statutory claims against Ford.  Ford argues that plaintiffs have failed to plead fraud with the requisite particularity.

### 1.  Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud . . . shall be stated with particularity."  "Mere allegations of fraud" will not satisfy the particularity requirement of Rule 9(b).  Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (internal quotation marks and citation omitted).  The rule requires a plaintiff to specify the identity of the person who made the allegedly fraudulent representation, and to specify the time, place, and content of the representation.  See Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997); Doyle, 103 F.3d at 194; see generally James Wm. Moore, et al., 2 Moore's Federal Practice § 9.03[1][b] (3d ed. 2001) ("[T]he reference to 'circumstances constituting fraud'

usually requires the claimant to allege at a minimum the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the representation was communicated.").

In their first fraud claim, plaintiffs contend that Ford misrepresented that it would approve the relocation of Fuller Ford's franchise to New Hampton. Specifically, plaintiffs allege that: (1) on May 29, 1996, an unnamed representative of Ford, while at the dealership, told Fuller Ford's employees that the relocation to New Hampton would occur, Cplt. ¶ 30; (2) at an unspecified time and place, Jeff Friedstedt, Ford's Regional Sales Manager, told Fred Fuller that the relocation would be approved, id. ¶ 32; and (3) at an unspecified time and place, one or more unnamed Ford employees assured plaintiffs that the relocation request would be approved, id. ¶¶ 37, 39; see also id. ¶¶ 34, 35, 132 (alleging that plaintiffs relied on Ford's misrepresentations to their detriment). These allegations fail to satisfy the requirements of Rule 9(b) because they do not each: (1) identify the person who made the allegedly fraudulent representation; and (2) specify the time, place, and content of the representation. See Ahmed, 118 F.3d at 889.

-12-

In their remaining fraud claims, plaintiffs contend that Ford, in the hope of preventing and/or delaying plaintiffs from suing Ford over the failed New Hampton relocation, made a number of misrepresentations with regard to the proposed relocation of Fuller Ford's franchise to Plymouth. See, e.g., Cplt. ¶¶ 41, 43, 53, 56. While some of plaintiffs allegations satisfy the requirements of Rule 9(b), see id. ¶¶ 45, 58, others do not.

Specifically, plaintiffs allege that: (1) at an unspecified time and place, an unnamed Ford employee advised Frederick Fuller about the availability of the Plymouth site and encouraged him to purchase and develop this site, id. ¶ 47; and (2) on or about November 12, 1997, at an unspecified place, an unnamed Ford employee assured Fuller Ford that other dealers in the Plymouth area would not protest the relocation, even though Ford knew that a protest was likely, id. ¶ 56; see also id. ¶¶ 58, 65-70 (alleging that Ford knew that Meredith Motors would protest the relocation). These allegations fail to satisfy the requirements of Rule 9(b) because they do not each: (1) identify the person who made the allegedly fraudulent representation; and (2) specify the time, place, and content of the representation. See Ahmed, 118 F.3d at 889.

-13-

Because plaintiffs have failed to plead fraud with the particularity required by Rule 9(b), I order them to amend their complaint so as to identify the person who made each allegedly fraudulent representation and to specify the time, place, and content of each representation. Plaintiffs shall file their amended complaint within thirty days of the issuance of this Memorandum and Order.[4]

**B.    Statutes of Limitation - The New Hampton Claims**

Ford argues that plaintiffs' New Hampton-related claims accrued on September 13, 1996, the day Ford denied Fuller Ford's request to relocate to New Hampton. See Cplt. ¶ 39. Because Plaintiffs did not initiate this litigation until November 13,

---

[4] Because I order plaintiffs to file an amended complaint, I need not address Ford's argument that plaintiffs' fraud claims must be dismissed because they are based on statements of opinion and/or on predictions. I note, however, that the New Hampshire Supreme Court has held that a plaintiff may state a fraud claim based on a "false statement as to what a person thinks . . . [or] knows in respect to a particular matter." Lampesis v. Comolli, 101 N.H. 279, 283 (1958) (internal quotation marks and citations omitted); see also Restatement (Second) of Torts § 525 cmts. d, f ("a statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable.").

2000, Ford contends that those claims are barred by the relevant statutes of limitation.[5]  See 15 U.S.C. § 1223 (three year statute of limitations governing ADDCA claims); N.H. Rev. Stat. Ann. §§ 357-C:13 (four year statute of limitations governing Motor Vehicle Franchise Act claims), 358-A:3, IV-a (three year statute of limitations governing Consumer Protection Act claims), 508:4, I (three year statute of limitations governing common law claims).

Because Ford moves to dismiss based on an affirmative defense, I may grant dismissal only if the "facts establishing the defense [are] clear on the face of the plaintiff[s]' pleadings."  Blackstone Realty LLC v. Federal Deposit Ins. Corp., 244 F.3d 193, 197 (1st Cir. 2001) (internal quotation marks and citation omitted).  The pleadings, and other documents properly considered under Federal Rule of Civil Procedure 12(b)(6), must

_____

[5]  The parties agree that New Hampshire's general statute of limitations, N.H. Rev. Stat. Ann. 508:4, I, governs plaintiffs' common law claims.  I accept their agreement for purposes of discussion.  See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (holding that a federal court sitting in diversity is free to accept the parties' agreement about what law governs their claims and may, therefore, forego an independent choice of law analysis).

"leave no doubt" that plaintiffs' claims are barred by the statutes of limitation. Id. (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998)). With this guidance in mind, I address Ford's limitations argument.

Under New Hampshire law, a cause of action accrues, and the statutes of limitation begin to run, when: (1) all of the necessary elements of the cause of action are present; and (2) the plaintiff knows, or reasonably should know, of his damage and the causal connection between that damage and the acts or omissions of the defendant.[6] See, e.g., Draper v. Brennan, 142 N.H. 780, 785-87 (1998); Conrad v. Hazen, 140 N.H. 249, 250-53 (1995) (discussing the distinction between when a cause of action "arises" and when it "accrues" for limitations purposes); Black Bear Lodge v. Trillium Corp., 136 N.H. 635, 637-38 (1993).

---

[6] I limit my analysis to New Hampshire law because, as discussed later in this Memorandum and Order, I grant Ford's motion to dismiss plaintiffs' ADDCA claims for other reasons. I note, however, that courts employ a similar standard when determining whether a cause of action under the ADDCA has accrued. See, e.g., Salem Mall Lincoln Mercury, Inc. v. Hyundai Motor America, 103 F. Supp. 2d 1032, 1037 (S.D. Ohio 2000) (holding that ADDCA claims accrue when "the plaintiff knows or has reason to know that the act providing the basis for its injury has occurred").

Ford contends, and I agree, that on September 13, 1996: (1) Fuller Ford suffered quantifiable damages, i.e., it was saddled with an expensive piece of land in New Hampton that it could not utilize for its intended purpose; and (2) it was clear that Ford's refusal to approve the relocation caused those damages. See Draper, 142 N.H. at 785-87; Conrad, 140 N.H. at 250-53; Rowe v. John Deere, 130 N.H. 18, 21-24 (1987) (holding that the existence of nominal damages is sufficient to give rise to a cause of action even though the plaintiff may not yet know the full extent of his damages). Accordingly, plaintiffs' New Hampton claims accrued on September 13, 1996. See id. Because more than four years passed between the accrual of plaintiffs' claims and the filing of their complaint on November 13, 2000, their claims will be barred by the statutes of limitation unless they are saved by some equitable exception which would toll the running of the applicable statutes. See N.H. Rev. Stat. Ann. §§ 357-C:13, 358-A:3, IV-a, 508:4, I.

Plaintiffs invoke two equitable doctrines which, they argue, toll the running of the statutes of limitation in this case: (1) the "continuing violation" doctrine; and (2) the "fraudulent

concealment" doctrine.[7]  Plaintiffs bear the burden of proving

that these doctrines are applicable to the facts of this case.

See Glines v. Bruk, 140 N.H. 180, 181 (1995).  I address

plaintiffs' arguments in turn.

### 1.    Continuing Violation

Plaintiffs argue that their claims regarding the New Hampton

relocation are not barred by the statute of limitations because

they are part of a continuing violation that extended into the

limitations period.  The short answer to this contention is that

while federal law recognizes the continuing violation doctrine in

the context of employment discrimination claims,[8] see O'Rourke v.

---

[7]  In its motion to dismiss, Ford anticipated that
plaintiffs would argue that Fuller Ford's appeal to the Policy
Board tolled the running of the statutes of limitation.  In their
response to Ford's motion, however, plaintiffs made no more than
a passing reference to this argument.  Accordingly, I deem
plaintiffs to have waived this argument.  See Transcript of
Hearing held on June 1, 2001 ("Tr."), (Doc. No. 26.1), at 22-26.

[8]  The First Circuit recognizes two varieties of continuing
violations:  serial violations and systematic violations.  See
Thomas v. Eastman Kodak Co., 183 F.3d 38, 53 (1st Cir. 1999),
cert. denied, 120 S.Ct. 1174 (2000).  The New Hampton relocation
claims cannot be considered part of a serial violation because a
serial violation cannot be claimed if, as is the case here, the
plaintiffs knew or reasonably should have known of their cause of
action at a point where they could have filed a timely claim.
See Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d
5, 15 (1st Cir. 1998).  The New Hampton relocation claims also

-18-

City of Providence, 235 F.3d 713, 730 (1st Cir. 2001), the New Hampshire Supreme Court has shown no inclination to incorporate the doctrine as an exception to the State's general statutes of limitation. Accordingly, I reject plaintiffs' continuing violation argument.

## 2. Fraudulent Concealment/Equitable Estoppel

Plaintiffs allege that when Fuller Ford expressed its intent to sue Ford over its denial of the proposed New Hampton relocation, Ford persuaded plaintiffs not to initiate litigation by promising to relocate Fuller Ford's dealership to Plymouth. See Cplt. ¶¶ 41-55. Plaintiffs further allege that Ford made this promise fraudulently because it knew that Meredith Motors would protest the relocation and that Ford would therefore be unable to relocate Fuller Ford to Plymouth. Id. ¶¶ 56, 65, 70, 131. Based on these allegations, plaintiffs invoke the fraudulent concealment rule.

cannot be considered part of a systematic violation because plaintiffs do not allege that the claims arose from a "policy or practice" that Ford applied to dealers other than the plaintiffs. See id. at 14. Thus, even if the New Hampshire Supreme Court were to recognize a continuing violation exception to the state's general statutes of limitation, that exception would not save the plaintiffs' claims in this case.

The "fraudulent concealment rule states that when facts essential to the cause of action are fraudulently concealed, the statute of limitations is tolled until the plaintiff has discovered such facts or could have done so in the exercise of reasonable diligence." Bricker v. Putnam, 128 N.H. 162, 165 (1986) (citing Lakeman v. LaFrance, 102 N.H. 300, 303-04 (1959)). Ford correctly points out, however, that the fraudulent concealment doctrine is not applicable here because plaintiffs do not allege that Ford concealed the existence of "facts essential to the cause of action." Id. Instead, plaintiffs allege that Ford fraudulently concealed its inability to fulfill its promise to relocate Fuller Ford to Plymouth in order to persuade plaintiffs to not file suit. Accordingly, plaintiffs may not avail themselves of the fraudulent concealment rule.

Plaintiffs' argument is more properly construed as a claim for equitable estoppel. See Tr. at 29. The New Hampshire Supreme Court has held that "[c]onduct of a nature giving rise to an equitable estoppel may be sufficient to toll the running of" statutes of limitation. Guerin v. New Hampshire Catholic Charities, Inc., 120 N.H. 501, 504 (1980); see Appeal of Kulacz,

756 A.2d 594, 597 (N.H. 2000) (concluding that plaintiff had failed to establish a case of equitable estoppel that would toll the statute of limitations); Appeal of Cloutier Lumber Co., 121 N.H. 420, 421-22 (1981) (holding that insurance company was equitably estopped from asserting the statute of limitations as a defense to a claim for workers compensation where it had assured the employee that he would receive full compensation if he was unable to work because of his injuries). Application of the doctrine of equitable estoppel "rests largely on the facts and circumstances of the particular case." Lago & Sons Dairy, Inc. v. H.P. Hood, Inc., 892 F. Supp. 325, 331 (D.N.H. 1995) (quoting Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 289 (1992) and discussing the elements of equitable estoppel).

Because plaintiffs have alleged facts which, if proved, could give rise to a claim of equitable estoppel that might preclude Ford from asserting its limitations defense, I deny Ford's motion to dismiss without prejudice to its right to renew its argument at summary judgment. Accordingly, I proceed to address the remaining arguments raised in defendants' motions to dismiss.

## C.   Breach of Contract

Plaintiffs allege that Ford entered into, and breached, the following contracts:  (1) an oral agreement to approve the relocation of Fuller Ford's franchise to New Hampton (the "New Hampton Contract"); and (2) a written agreement to relocate Fuller Ford's franchise to Plymouth (the "Plymouth Contract").[9] I address each claim in turn.

### 1.   The New Hampton Contract

Plaintiffs allege that Ford orally agreed, through its representatives, that it would approve the relocation of Fuller Ford to New Hampton and that Ford subsequently breached that agreement.  Specifically, plaintiffs allege that: (1) Ford's representative "announced to all of the assembled Fuller Ford employees that the move to New Hampton was to occur," Cplt. ¶ 30;

---

[9]  Plaintiffs also contend that Ford breached its obligations under the Dealer Agreement to act in "good faith" towards Fuller Ford.  I construe the references to "good faith" in the Dealer Agreement as an explicit acknowledgment of Ford's duty, under both the Motor Vehicle Franchise Act and the implied covenant of good faith and fair dealing, to act in good faith towards Fuller Ford, rather than as giving rise to enforceable contractual rights.  Accordingly, I analyze these allegations in the sections of this Memorandum and Order which address the Motor Vehicle Franchise Act and the implied covenant of good faith and fair dealing.

(2) Ford's Regional Sales Manager "made an express representation" to Frederick Fuller "that approval to relocate his dealership to New Hampton would be granted and that he should begin preparing for the move," id. ¶ 32; and (3) Ford's regional representatives assured plaintiffs that the relocation would be approved, id. ¶ 37.

In moving to dismiss this claim, Ford argues: (1) that the agents who allegedly agreed, on behalf of Ford, to approve the relocation lacked the authority to do so; and (2) that the New Hampton Contract was not binding because it was not in writing, as is required by the Dealer Agreement. As discussed below, I agree.

Plaintiffs do not contend that Ford's regional representatives had actual authority to approve the relocation, rather plaintiffs argue that they had the apparent authority to do so. "Apparent authority may arise when acts and appearances lead a third person reasonably to believe that an agency relationship exists."[10] Meretta v. Peach, 491 N.W.2d 278, 280

---

[10] The parties rely primarily on Michigan law when addressing the question of apparent authority. Because there is no material difference between the law of apparent authority in Michigan and New Hampshire, I need not decide which state's law

(Mich. Ct. App. 1992); see Demetracopoulos v. Strafford Guidance Ctr., 130 N.H. 209, 215-16 (1987).  Such authority "must flow from the representations of the principal and not the representations of the alleged agent."  Potomac Leasing Co. v. French Connection Shops, Inc., 431 N.W.2d 214, 217 (Mich. Ct. App. 1988); see Meretta, 491 N.W.2d at 280; Demetracopoulos, 130 N.H. at 215-16; Daniel Webster Council, Inc. v. St. James Ass'n, Inc., 129 N.H. 681, 683 (1987).  In evaluating a claim of apparent authority, a court must ascertain whether "an ordinarily prudent person, conversant with [the relevant industry], would be justified in assuming" that the alleged agent possessed the authority to perform the act in question.  Meretta, 491 N.W.2d at 280; see Demetracopoulos, 130 N.H. at 215-16; Daniel Webster Council, Inc., 129 N.H. at 683; see also Restatement (Second) of Agency § 27 ("apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act

_____

to apply.  See Fratus v. Republic Western Ins. Co., 147 F.3d 25, 28 (1st Cir. 1998); Fashion House, Inc. v. Kmart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989).

done on his behalf" by the purported agent).

Even assuming that all of plaintiffs' allegations are true, an ordinarily prudent person would not be justified in concluding that Ford's regional representatives possessed the authority to approve the relocation of Fuller Ford's franchise to New Hampton. The Dealer Agreement specifically provides that: (1) Fuller Ford may not move its franchise without the prior written consent of Ford; and (2) only certain specified employees and officers of Ford may execute any agreement on Ford's behalf, and that any such agreement must be in writing.[11] See Ford Sales and Service Agreement (the "Dealer Agreement"), Exh. A to Ford's Mot. to Dismiss, (Doc. No. 11), ¶ E, Standard Provisions at ¶ 5(c); see also id., Standard Provisions at ¶ 26 ("This agreement . . . constitutes the entire agreement between the parties with respect

---

[11] The First Circuit has held that when a "complaint's factual allegations are expressly linked to - and admittedly dependent upon - a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); see Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993). Accordingly, I may consider the Dealer Agreement, which Ford appended to its motion to dismiss, without converting Ford's motion into a motion for summary judgement. Beddall, 137 F.3d at 17.

to the subject matter hereof."). Plaintiffs make no allegations which suggest that Ford, as principal, manifested an intent to allow its regional representatives to waive the requirements of the Dealer Agreement and approve relocations orally. See Potomac Leasing Co., 431 N.W.2d at 217 (holding that a purported agent lacked authority to modify a lease where the lease provided that it could only be modified "by an instrument in writing signed by the lessee and a corporate officer of the lessor"); Daniel Webster Council, Inc., 129 N.H. at 683. Accordingly, I reject plaintiffs' apparent authority argument. Because Ford's regional representatives had no authority to approve the relocation, no contract was ever formed. Therefore, I grant Ford's motion to dismiss this claim.

### 3. The Plymouth Contract

Ford does not dispute that it agreed to relocate Fuller Ford to Plymouth.[12] Ford contends, however, that the decision of the

---

[12] Although plaintiffs contend that the Plymouth Contract is a written agreement, see Tr. at 2-3, they do not specify when or where it was made, or what state's law should govern it. Accordingly, I rely on general principles of contract law. I note, however, that both New Hampshire and Michigan appear to have adopted the impossibility doctrine. See, e.g., Auger v. Chapdelaine, 106 N.H. 246, 248 (1965) (discussing impossibility); Vergote v. K Mart Corp., 404 N.W.2d 711, 717-18 (Mich. Ct. App.

Motor Vehicle Board rendered performance of the Plymouth Contract

impossible.

As Ford notes, it is black letter law that:

> Where, after a contract is made, a party's
> performance is made impracticable without his
> fault by the occurrence of an event the
> non-occurrence of which was a basic assumption
> on which the contract was made, his duty to
> render that performance is discharged, unless
> the language or the circumstances indicate the
> contrary.

Restatement (Second) of Contracts § 261. Thus, as a general

matter, an administrative or judicial order barring completion of

a contract excuses performance. Id. at § 264.

Plaintiffs contend, however, that Ford may not avail itself

of the impossibility doctrine at this juncture for two reasons.

First, they argue that Ford knew, or reasonably should have

known, that, under New Hampshire law, it had to provide good

cause for its relocation decision and that other dealers, such as

Meredith Motors, might challenge Ford's actions. Second, they

contend that Ford failed to satisfy its obligation to make a

reasonable, good faith effort to prevent the supervening

---

1987) (same).

impossibility, i.e., they contend that Ford should have reached a settlement with Meredith Motors. Because I agree with the first argument, I need not address the latter.

Many courts have held that "[i]f the event that is the basis of a claim of impossibility is reasonably foreseeable . . . the defense will be lost because the promisor should have provided for the contingency in the contract." John D. Calamari and Joseph M. Perillo, The Law of Contracts § 13.18 (4th ed. 1998) (collecting cases); see, e.g., Vergote, 404 N.W.2d at 717-718 (stating that the availability of the impossibility defense "may depend upon whether the supervening event . . . was or was not reasonably foreseeable when [the defendant] entered into the contract."); see also Restatement (Second) of Contracts § 261, cmts. b, c (discussing foreseeability). Accordingly, plaintiffs could potentially negate Ford's impossibility defense if they could offer facts showing that Ford knew, or reasonably should have known: (1) that New Hampshire's Motor Vehicle Franchise Act required Ford to show "good cause" for realigning Meredith Motors' sales territory, and that it could not make such a showing under the circumstances; and (2) that Meredith Motors

would protest the relocation.  See N.H. Rev. Stat. Ann. § 357-C:9.  Accordingly, I deny Ford's motion to dismiss this claim.

**D.    The Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs contend that Ford breached the implied covenant of good faith and fair dealing inherent in the Dealer Agreement by:  (1) inducing plaintiffs to purchase the New Hampton site and then refusing to relocate Fuller Ford's franchise to that site; (2) inducing plaintiffs to purchase the Plymouth site, misrepresenting that it was unlikely that other dealers would protest the relocation of Fuller Ford's franchise to that site, and ultimately failing to relocate the franchise; and (3) not acting to prevent FMCC from terminating Fuller Ford's line of credit.[13]  See Cplt. ¶¶ 84(a), 93.  Ford moves to dismiss these claims.  I begin my analysis by determining which state's law to apply to plaintiffs' claims.

_____

[13]  In addition, in Count II of their amended complaint, plaintiffs assert, albeit unclearly, that Ford also violated the covenants of good faith and fair dealing inherent in the New Hampton Contract and the Plymouth Contract.  See Cplt. ¶¶ 91-97. Because I have already concluded that Ford's agents lacked the authority to enter into the alleged New Hampton contract, I dismiss plaintiffs' good faith and fair dealing claim based on that agreement.  Because Ford has not addressed the sufficiency of plaintiffs' good faith and fair dealing claim based on the Plymouth Contract, that claim remains.

### 1. **Michigan Law**

The Dealer Agreement provides that the parties intend it to be construed in accordance with Michigan Law.[14] Dealer Agreement, Standard Provisions at ¶ 32. Although plaintiffs agree that, in general, the Dealer Agreement should be construed in accordance with Michigan law, they argue that I should interpret their good faith and fair dealing claims in accordance with New Hampshire law. I reject this argument. Because plaintiffs' claims depend, in the first instance, on whether the Dealer Agreement, as construed under Michigan law, confers sufficient discretion upon Ford such that the implied covenant attaches, I apply Michigan law to plaintiffs' good faith and fair dealing claims. See Caton v. Leach Corp., 896 F.2d 939, 943 (5th Cir. 1990); Carlock v. Pillsbury Co., 719 F. Supp. 791, 807 (D. Minn. 1989) (collecting cases supporting the proposition that "[c]ontractual choice of law provisions apply to claims for breach of the implied covenants of good faith and fair dealing").

---

[14] New Hampshire recognizes such choice of law provisions when the contract bears a significant relationship to the jurisdiction whose law is designated as the rule of decision. See Allied Adjustment Serv. v. Heney, 125 N.H. 698, 700 (1984). The requisite relationship is present here because Ford has its principal place of business in Michigan. See id.

"When a contracting party makes the manner of its performance subject to its own discretion, [Michigan] law will imply that the discretion be exercised honestly and in good faith." Jacobson v. BH Assocs. L.P., No. 222945, 2001 WL 738408, *2 (Mich. Ct. App. June 29, 2001) (per curiam); see Sims v. Buena Vista Sch. Dist., 360 N.W.2d 211, 213-14 (Mich. Ct. App. 1984) (per curiam); Burkhardt v. City Nat'l Bank of Detroit, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975). The implied covenant "seeks to protect the contracting parties' reasonable expectations" by supplying limits to the parties' exercise of discretion. Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 876 (5th Cir. 1989) (interpreting Michigan law). It does not, however, "override the express terms of the parties' contract, and cannot form the basis for a claim independent of that contract." Clark Bros. Sales Co. v. Dana Corp., 77 F. Supp. 2d 837, 852 (E.D. Mich. 1999) (applying Michigan law); see Hubbard Chevrolet Co., 873 F.2d at 877. Thus, whether the implied covenant of good faith and fair dealing even comes "into play" in this case depends upon the language of the Dealer Agreement. See Hubbard Chevrolet Co., 873 F.2d at 877; Paradata Computer Networks, Inc. v. Telebit Corp., 830 F. Supp. 1001, 1005 (E.D. Mich. 1993)

("Whether a performance is a matter of a party's discretion depends on the nature of the agreement between them").  I now address plaintiffs' claims.

## 2.    The Relocation Claims

With regard to their claims regarding the proposed relocations to New Hampton and Plymouth, plaintiffs have identified language in the Dealer Agreement to which, they contend, the implied covenant attaches.  Specifically, Paragraph 5(c) provides that Fuller Ford cannot change the location of its dealership "without the prior written consent of" Ford.  Dealer Agreement, Standard Provision at ¶ 5(c).  Plaintiffs argue that Ford must act in good faith when exercising its discretion under Paragraph 5(c) in deciding whether to consent to a dealership's relocation request.  In contrast, Ford interprets Paragraph 5(c) as granting Ford absolute discretion to approve or deny a relocation request.  Therefore, Ford argues, the implied covenant does not attach.  See, e.g., Hubbard Chevrolet Co., 873 F.2d at 877-78; Bertera Chrysler Plymouth, Inc. v. Chrysler Corp., 992 F. Supp. 64, 73 (D. Mass. 1998); Paradata Computer Networks, Inc., 830 F. Supp. at 1005-06.

Michigan interprets contracts under the plain meaning rule. See Kukowski v. Piskin, 297 N.W.2d 612, 613 (Mich. Ct. App. 1980). Under that rule, if contract language is unambiguous, then its construction is a matter of law for the court and the language must be given its plain meaning. See Ford Motor Co. v. Northbrook Ins. Co., 838 F.2d 829, 832 (6th Cir. 1988) (applying Michigan law); Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area Sch. Dist., 550 N.W.2d 228, 237 (Mich. 1996). "Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." Port Huron Educ. Ass'n, 550 N.W.2d at 237.

In the present case, I determine that plaintiffs' interpretation of Ford's obligations under Paragraph 5(c) is reasonable. I therefore need not decide at this point whether Ford's alternative interpretation is also reasonable.

In addition to alleging sufficient facts to "bring the covenant into play," plaintiffs have alleged sufficient facts to support an allegation that Ford acted in bad faith. Bad faith is defined as "'arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty.'" Maida v.

Retirement and Health Servs. Corp., 36 F.3d 1097, Nos. 93-1625, 93-1635, 1994 WL 514521, *5 (6th Cir. Sept. 19, 1994) (table; text available on Westlaw) (per curiam) (citation omitted). Plaintiffs have alleged that Ford acted in bad faith by encouraging them to purchase the New Hampton and Plymouth properties knowing that it would not allow Fuller Ford to relocate to either location.

Because plaintiffs have identified language in the Dealer Agreement to which an implied covenant of good faith and fair dealing could attach and have alleged facts that would support an inference of bad faith, I deny Ford's motion to dismiss these claims.

### 3. The FMCC Claim

Plaintiffs fail to identify any language in the Dealer Agreement to which an implied covenant of good faith could attach with regard to their claim that Ford failed to act in the face of FMCC's termination of Fuller Ford's line of credit. See Hubbard Chevrolet Co., 873 F.2d at 877. Accordingly, I grant Ford's motion to dismiss this claim.

## E.    **ADDCA Claims**

Plaintiffs assert that Ford violated the Automobile Dealer Day in Court Act ("ADDCA") by:  (1) encouraging Fuller Ford to purchase the New Hampton site and then denying its request to relocate there; and (2) coercing Fuller Ford into purchasing the Plymouth site even though it knew that it could not guarantee that the relocation to Plymouth would be successful.  In order to prevail on their ADDCA claims, plaintiffs must show that they were wrongfully injured by Ford's "failure to act in good faith." See 15 U.S.C. § 1222; Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 93 (3d Cir. 2000) (discussing the elements of an ADDCA claim).  Ford argues that these claims should be dismissed because plaintiffs have failed to plead facts which, if true, would show that Ford failed to act in good faith.  As discussed below, I agree.

The First Circuit has adopted a very narrow interpretation of the phrase "failure to act in good faith," as used in the ADDCA.  See General GMC, Inc. v. Volvo White Truck Corp., 918 F.2d 306, 308 (1st Cir. 1990); H.D. Corp. of Puerto Rico v. Ford Motor Co., 791 F.2d 987, 990 (1st Cir. 1986); Wallace Motor

Sales, Inc. v. American Motors Sales Corp., 780 F.2d 1049, 1056 (1st Cir. 1985); see also 15 U.S.C. § 1221(e) (defining "good faith"). To satisfy this element of their ADDCA claims, plaintiffs must show that Ford engaged in "actual or threatened coercion or intimidation" and that, as a result, Fuller Ford was "forced to act or refrain from acting and that it suffered damage." Wallace Motor Sales, Inc., 780 F.2d at 1056. This coercion or intimidation "must include a wrongful demand that would result in penalties or sanctions if not complied with." Id. Mere "recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C. § 1221(e).

Plaintiffs do not allege that Ford threatened to penalize or sanction Fuller Ford for not relocating to a new site. At best, the complaint suggests that Ford strongly encouraged or persuaded Fuller Ford to purchase the New Hampton and Plymouth sites. See 15 U.S.C. § 1221(e). Because this falls far short of the coercion or intimidation required to state an ADDCA claim, I grant Ford's motion to dismiss these claims. See id.; General GMC, Inc., 918 F.2d at 308; H.D. Corp. of Puerto Rico, 791 F.2d

at 990-92 (affirming dismissal of an ADDCA claim where the complaint failed to state specific acts of coercion); Wallace Motor Sales, Inc., 780 F.2d at 1056.

**F.   Motor Vehicle Franchise Act**

Plaintiffs assert three claims against Ford under the Motor Vehicle Franchise Act.  Ford moves to dismiss two of those claims.[15]

**1.    Unreasonable Restriction**

Plaintiffs contend that Ford's disapproval of the New Hampton relocation violated Section 357-C:3, III (n) of the Motor Vehicle Franchise Act, which provides that a manufacturer may not:

> impose unreasonable restrictions on the
> motor vehicle dealer or franchisee relative
> to transfer, sale, right to renew,
> termination, discipline, noncompetition
> covenants, site-contract, right of first
> refusal to purchase, option to purchase,
> compliance with subjective standards, or
> assertion of legal or equitable rights.

N.H. Rev. Stat. Ann. § 357-C:3, III (n).  Ford argues that Section 357-C:3, III (n) does not give rise to a cause of action

---

[15]  Ford does not move to dismiss plaintiffs' claim that Ford violated Section 357-C:3, I of the Motor Vehicle Franchise Act.  See Cplt. ¶¶ 104-108.

based on a manufacturer's refusal to relocate a dealership.

When interpreting a New Hampshire statute, I must "first examine the language found in the statute." Appeal of Astro Spectacular, Inc., 138 N.H. 298, 300 (1994). I must consider the statute as a whole, and not rely solely on "isolated words or phrases." St. Joseph Hosp. of Nashua v. Rizzo, 141 N.H. 9, 11 (1996); see Opinion of the Justices, 135 N.H. 543, 545 (1992). To the extent that a term is not defined in the statute, I give that term "its plain and ordinary meaning." New Hampshire Div. of Human Servs. v. Hahn, 133 N.H. 776, 778 (1990). I may not, however, "ignore the plain language of the legislation [or] add words which the lawmakers did not see fit to include." Appeal of Astro Spectacular, Inc., 138 N.H. at 300 (quoting Brown v. Brown, 133 N.H. 442, 445 (1990)); see also St. Joseph Hosp. of Nashua, 141 N.H. at 11-12 ("Normally the expression of one thing in a statute implies the exclusion of another." (internal quotation marks and citation omitted)).

Although Section 357-C:3, III (n) does not expressly refer to relocations, plaintiffs contend that the term "site-contract" could reasonably be interpreted to refer to how a dealer may utilize the site of his franchise, including whether or not she

may relocate all or part of that franchise to a new site. This issue has not been developed well enough in the briefs for me to reliably respond to plaintiffs' contention. Accordingly, I deny Ford's motion to dismiss this claim, without prejudice to its right to renew its argument at summary judgment.

## 2. Constructive Termination

Plaintiffs allege that Ford constructively terminated Fuller Ford's franchise without good cause, in violation of Section 357-C:7, I of the Motor Vehicle Franchise Act, when it: (1) encouraged Fuller Ford to obtain the Plymouth site; and (2) refused to intercede when FMCC terminated Fuller Ford's line of credit. Section 357-C:7, I provides that "no manufacturer shall cancel, terminate, fail to renew, or refuse to continue any franchise relationship" with a dealer unless the manufacturer has: (1) notified the dealer in writing of the prospective termination not less than ninety days prior to the effective date of such termination; (2) acted in good faith; and (3) good cause for his actions. N.H. Rev. Stat. Ann. § 357-C:7, I.

Ford argues that: (1) Section 357-C:7, I does not provide a cause of action for constructive termination; and, in any event, (2) this claim is barred by the terms of the Dealer Agreement.

Because I agree with the first argument, I need not address the latter.

First, I note that Section 357-C:7, I does not expressly refer to constructive termination. See St. Joseph Hosp. of Nashua, 141 N.H. at 11-12; Appeal of Astro Spectacular, Inc., 138 N.H. at 300. Moreover, Section 357-C:7, I requires that a terminated dealer receive notice from the manufacturer. See Appeal of Astro Spectacular, Inc., 138 N.H. at 300; Opinion of the Justices, 135 N.H. at 545; Hahn, 133 N.H. at 778. This notice requirement protects a dealer against a manufacturer's sudden and unwarranted decision to terminate a franchise. Where, as is alleged here, a dealer, e.g., Fuller Ford, feels compelled to terminate its relationship with a manufacturer, Section 357-C:7, I's notice requirement is irrelevant. Moreover, construing Section 357-C:7, I to provide a cause of action for constructive termination would lead to an absurd result: a dealer could sever his relationship with a manufacturer, claim constructive termination, and argue that the manufacturer had failed to provide him with the notice required by statute. See Doggett v. Town of North Hampton Zoning Bd. of Adjustment, 138 N.H. 744, 746 (1994) (holding that a court should construe a statute so as to

effectuate its evident purpose and to "avoid an interpretation that would lead to an absurd or unjust result"). To the extent that the Motor Vehicle Franchise Act provides for a cause of action in the event of a constructive termination, a plaintiff's proper recourse is to Section 357-C:3, I, which makes it unlawful for a manufacturer "to engage in any action which is arbitrary, in bad faith, or unconscionable." See Nault v. N&L Dev. Co., 767 A.2d 406, 408 (N.H. 2001) ("All statutes upon the same subject-matter are to be considered in interpreting any one of them . . . [a court must] construe [those statutes] so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute." (citation omitted)). Accordingly, I conclude that Section 357-C:7, I does not apply to constructive terminations and, therefore, I grant Ford's motion to dismiss this claim.

## G. Tortious Interference

Plaintiffs allege that Ford wrongfully interfered with their relationship with current and potential customers in the Bristol area. To prevail on this claim, plaintiffs must prove that: (1) they had an economic relationship with a third party; (2) Ford knew of the relationship; (3) Ford intentionally and improperly

interfered with the relationship; and (4) plaintiffs were damaged by this interference.  See Montrone v. Maxfield, 122 N.H. 724, 726 (1982); Baker v. Dennis Brown Realty, Inc., 121 N.H. 640, 644 (1981); see also Restatement (Second) of Torts § 766B.  Ford argues that this claim must be dismissed because plaintiffs fail to allege that they had an economic relationship with a third party.

A plaintiff may not base a tortious interference claim solely on his potential relationship with consumers in a given market.  See Heritage Home Health, Inc. v. Capital Region Health Care Corp., Civ. No. 95-558-JD, 1996 WL 655793, *4 (D.N.H. Oct. 1, 1996) ("The court has found no authority for the proposition that a plaintiff may bring an action for tortious interference with prospective contractual relations based solely on a plaintiff's potential for capturing a share of a given market.").  Thus, I dismiss that portion of plaintiffs' tortious interference claim which relies on their potential relationship with consumers in the Bristol area.  See id.

Plaintiffs may, however, attempt to show that Ford tortiously interfered with their relationships with specific customers in the Bristol area.  See id.  Accordingly, I deny

-42-

Ford's motion to the extent that plaintiffs claim that Ford interfered with such relationships.

## H. The Claims Against FMCC

Plaintiffs allege that FMCC violated the terms of the Application for Wholesale Financing and Security Agreement (the "Financing Agreement"), and the covenant of good faith and fair dealing implied therein, when it terminated Fuller Ford's line of credit.[16] FMCC moves to dismiss both claims, arguing that it had no obligation under the Financing Agreement to extend credit to Fuller Ford.[17] See <u>Ford Motor Credit Co. v. Devalk Lincoln-</u>

------------------------------------------------------------

[16] I may consider the Financing Agreement without converting FMCC's motion into a motion for summary judgement because: (1) plaintiffs' factual allegations are linked to that agreement; (2) FMCC attached a copy of the Financing Agreement to its motion to dismiss; and (3) plaintiffs do not dispute the authenticity of that attachment. See <u>Beddall</u>, 137 F.3d at 17.

[17] FMCC bases its argument on Paragraph One of the Financing Agreement, which provides, in relevant part, as follows:

> [FMCC] at all times shall have the right in its sole discretion to determine the extent to which, the terms and conditions on which, and the period for which it will make such advances, purchase such contracts, or otherwise extend credit to [Fuller Ford] . . . [FMCC] may, at any time and from time to time, in its sole discretion, establish, rescind or change limits or the extent to which financing accommodations under the [Ford Credit

-43-

Mercury, Inc., 600 F. Supp. 1547, 1550-51 (N.D. Ill. 1985).

I interpret the Financing Agreement in accordance with New Hampshire law.[18] When construing a contract, New Hampshire courts "analyze the entire document to determine the meaning intended by the parties." Echo Consulting Servs., Inc. v. North Conway Bank, 140 N.H. 566, 569 (1995); see Chadwick v. CSI, Ltd., 137 N.H. 515, 524-25 (1993). "Language used by the parties should be given its standard meaning as understood by reasonable people." Echo Consulting Servs., Inc., 140 N.H. at 569. "In the absence of ambiguity, the intent of the parties . . . is to be determined from the plain meaning of the language used." Id.; see Robbins v. Salem Radiology, 764 A.2d 885, 887 (N.H. 2000).

Although FMCC makes an interesting argument, I cannot address it at this stage of the proceedings. The Financing Agreement states that Fuller Ford "requests [FMCC] to establish

---

Wholesale] Plan will be made available to [Fuller Ford.]
Financing Agreement, Exh. A to FMCC's Mot. to Dismiss, (Doc. No. 12).

[18] The Financing Agreement provides that it shall be interpreted in accordance with the laws of Fuller Ford's place of business, i.e., New Hampshire. See Allied Adjustment Serv., 125 N.H. at 700.

and maintain . . . a wholesale line of credit . . . under the terms of the Ford Credit Wholesale Plan." Because the parties have not provided me with a copy of the Ford Credit Wholesale Plan, and because the terms of that document may significantly modify the terms of the Financing Agreement, I cannot evaluate FMCC's arguments at this time. See Echo Consulting Servs., Inc., 140 N.H. at 569; Chadwick, 137 N.H. at 524-25. Accordingly, I deny FMCC's motion to dismiss without prejudice to its right to renew its arguments at summary judgment.

## IV. CONCLUSION

In summary, I order plaintiffs to file an amended complaint and I deny FMCC's motion to dismiss, (Doc. No. 12). I grant Ford's motion to dismiss, (Doc. No. 11), plaintiffs' claims for: (1) breach of the New Hampton Contract; (2) breach of the covenant of good faith and fair dealing implied in the New Hampton Contract; (3) breach of the covenant of good faith and fair dealing implied in the Dealer Agreement, to the extent this claim is based on Ford's failure to act with regard to FMCC's termination of Fuller Ford's line of credit; (4) violations of

-45-

the ADDCA; (5) constructive termination under N.H. Rev. Stat. Ann. § 357-C:7, I; and (6) tortious interference, to the extent that this claim is based on plaintiffs' relationship with potential customers in Bristol.  I deny Ford's motion in all other respects.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

August 6, 2001

cc:   Eric L. Chase, Esq.
      Phillip A. Brouillard, Esq.
      Gabriel Nizetic, Esq.
      Robert R. Lucie, Esq.
      Nicholas T. Christakos, Esq.